UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JEFFERY DAVIS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-2659** |
| **DARREL VANNOY** | **SECTION: "F"(1)** |

### REPORT AND RECOMMENDATION

Petitioner, Jeffery Davis, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On October 5, 2012, petitioner was convicted of second degree murder under Louisiana law.[1] On October 11, 2012, he was sentenced to a term of life imprisonment without benefit of parole, probation, or suspension of sentence.[2] The Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence on October 30, 2013,[3] and the Louisiana Supreme Court denied his related writ application on May 23, 2014.[4]

After almost a year passed, petitioner filed an application for post-conviction relief with the state district court on May 20, 2015.[5] That application was denied on October 28, 2015.[6] His

---

[1] State Rec., Vol. 10 of 12, transcript of October 5, 2012, p. 98; State Rec., Vol. 1 of 12, minute entry dated October 5, 2012; State Rec., Vol. 1 of 12, jury verdict form.
[2] State Rec., Vol. 10 of 12, transcript of October 11, 2012; State Rec., Vol. 1 of 12, minute entry dated October 11, 2012.
[3] State v. Davis, 128 So. 3d 1162 (La. App. 5th Cir. 2013); State Rec., Vol. 2 of 12.
[4] State v. Davis, 140 So. 3d 723 (La. 2014); State Rec., Vol. 2 of 12.
[5] State Rec., Vol. 2 of 12. Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing by a *pro se* prisoner, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record in this instance, the Court has simply used the signature date of the application as the filing date, in that the application was obviously placed in the mail no earlier than the date it was signed.
[6] State Rec., Vol. 3 of 12, Order dated October 28, 2015.

related writ applications were thereafter likewise denied by the Louisiana Fifth Circuit Court of Appeal on December 28, 2015,[7] and the Louisiana Supreme Court on June 5, 2017.[8]

Approximately eight months later, petitioner then filed the instant federal application seeking habeas corpus relief on March 8, 2018.[9] After he eventually paid the required filing fee some eleven months later in February of 2019, the state filed a response contending, *inter alia*, that the application was untimely.[10] Petitioner filed a reply arguing that his application should be deemed timely because he was entitled to equitable tolling of the statute of limitations.[11] For the following reasons, the undersigned rejects petitioner's argument and finds that his application was indeed untimely.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner is generally required to bring his § 2254 claims within one (1) year of the date on which his underlying state criminal judgment became "final." 28 U.S.C. § 2244(d)(1)(A).[12] With respect to determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

---

[7] State v. Davis, No. 15-KH-776 (La. App. 5th Cir. Dec. 28, 2015); State Rec., Vol. 3 of 12.
[8] State *ex rel.* Davis v. State, 221 So. 3d 59 (La. 2017); State *ex rel.* Davis v. State, 220 So. 3d 1292 (La. 2017); State Rec., Vol. 3 of 12.
[9] Rec. Doc. 1. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner has declared under penalty of perjury that his application was placed in the prison mailing system on March 8, 2018. Rec. Doc. 1, p. 15.
[10] Rec. Doc. 10.
[11] Rec. Doc. 11.
[12] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events that can trigger a delayed commencement of the statute of limitations in some circumstances, those alternative provisions are not applicable in the instant case.

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

As noted, the Louisiana Supreme Court denied petitioner's direct-review writ application on May 23, 2014. Therefore, his state criminal judgment became final for AEDPA purposes on August 21, 2014. As a result, his federal limitations period commenced on that date and then expired one year later, unless that deadline was extended through tolling.

The Court first considers statutory tolling. Regarding the statute of limitations, the AEDPA expressly provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

After two hundred seventy-one (271) days elapsed, petitioner tolled his federal limitations period in the instant case by filing a post-conviction application with the state district court on May 20, 2015. Although that application was denied by the district court, it nevertheless remained "pending" for the purposes of § 2244(d)(2) for the duration of the post-conviction proceedings, so long as petitioner continued to seek review at the higher levels of the state court system in a timely manner. Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004). Here, the state does not argue that petitioner's related writ applications were untimely filed; rather, the state appears to concede that tolling continued until the Louisiana Supreme Court denied post-conviction relief on June 5, 2017.[13] The undersigned agrees.

---

[13] See Rec. Doc. 10, p. 6. As the state correctly notes, the limitations period resumed running once the Louisiana Supreme Court denied petitioner's collateral-review writ applications, because a petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief. Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

3

Once the limitations period then resumed running at that point, petitioner had only ninety-four (94) days remaining. Accordingly, he had only until **September 7, 2017**, either to again toll the limitations period or to file his federal application.

Petitioner had no other applications pending before the state courts at any time on or before September 7, 2017. Therefore, he clearly is not entitled to further statutory tolling.

The Court must next consider equitable tolling. Petitioner argues that equitable tolling is warranted in his case because he did not receive notice of the Louisiana Supreme Court's decisions on his collateral-review writ applications in a timely manner after relief was denied on June 5, 2017. He alleges, and the state appears to concede,[14] that he did not receive actual notice of those decisions until February 1, 2018, when he received correspondence from the Louisiana Supreme Court sent in response to his inquiry concerning the status of his cases. The state further concedes that petitioner's federal application is timely *if* he is entitled to equitable tolling from the date of the Louisiana Supreme Court's decisions (June 5, 2017) until the date he received notice of those decisions (February 1, 2018). However, the state argues that equitable tolling is *not* warranted in this case because petitioner failed to act diligently. For the following reasons, the undersigned again agrees.

Although the AEDPA's statute of limitations "is subject to equitable tolling in appropriate cases," Holland v. Florida, 560 U.S. 631, 645 (2010), it is nonetheless "unavailable in *most* cases," Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999) (emphasis added). Specifically, "a petitioner is entitled to equitable tolling *only* if he shows *both* that (1) he has been pursuing his rights diligently, *and* (2) some extraordinary circumstance stood in his way and prevented timely filing."

---

[14] See Rec. Doc. 10, p. 7.

4

Holland, 560 U.S. at 649 (emphasis added; internal quotation marks omitted). Regarding the two prongs of the Holland test, the United States Supreme Court has explained:

> [W]e have expressly characterized equitable tolling's two components as "elements," not merely factors of indeterminate or commensurable weight. Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) ("Generally, a litigant seeking equitable tolling bears the burden of establishing two elements"). And we have treated the two requirements as distinct elements in practice, too, rejecting requests for equitable tolling where a litigant failed to satisfy one without addressing whether he satisfied the other. See, e.g., Lawrence v. Florida, 549 U.S. 327, 336-337, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) (rejecting equitable tolling without addressing diligence because habeas petitioner fell "far short of showing 'extraordinary circumstances'"); Pace, supra, at 418, 125 S.Ct. 1807 (holding, without resolving litigant's argument that he had "satisfied the extraordinary circumstance test," that, "[e]ven if we were to accept [his argument], he would not be entitled to relief because he has not established the requisite diligence").

Menominee Indian Tribe of Wisconsin v. United States, 136 S. Ct. 750, 756 (2016).[15] Moreover, a petitioner always bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).

The undersigned finds that petitioner's failure to receive notice of the Louisiana Supreme Court rulings could in fact qualify as an "extraordinary circumstance." See, e.g., Williams v. Thaler, 400 F. App'x 886, 892 (5th Cir. 2010) ("Our delayed notice cases demonstrate that the simple fact that a petitioner did not receive notice that the AEDPA limitations period had ceased to toll may be an extraordinary circumstance that warrants equitable tolling.") (citing Phillips v. Donnelly, 216 F.3d 508, 511 (5th Cir.), *reh'g granted and modified in part on other grounds*, 223 F.3d 797 (2000)). Nevertheless, even so, that is only *half* of petitioner's battle; as noted, he must *also* establish that he pursued his rights *diligently*, because "[e]quity is not intended for those who

---

[15] Menominee Indian Tribe was not a habeas corpus case. However, its equitable tolling discussion is expressly based on the Supreme Court's interpretation of Holland; therefore, the reasoning therein is applicable to habeas cases. See, e.g., Brian R. Means, Federal Habeas Manual § 9A:83 (2020).

sleep on their rights." Mathis v. Thaler, 616 F.3d 461, 474 (5th Cir. 2010) (quotation marks omitted).

Regarding the diligence requirement, it is clear that a petitioner need not show that he exercised the "maximum feasible diligence"; rather, "[t]he diligence required for equitable tolling purposes is *reasonable* diligence." Holland, 560 U.S. at 563 (emphasis added; quotation marks omitted). Nonetheless, the undersigned cannot say that petitioner exercised even reasonable diligence in this case for the following reasons.

As an initial matter, it must be noted that petitioner did not seek post-conviction relief in the state courts with diligence and alacrity. On the contrary, although his state criminal judgment became final for AEDPA purposes on August 21, 2014, he nevertheless waited until May 20, 2015, to seek post-conviction relief in the state courts – in other words, he allowed *nine months* (or approximately *75%* of his one-year federal limitations period) to elapse before he even began seeking such relief. In this Circuit, similar delays in seeking post-conviction relief have been considered indicative of a lack of diligence for equitable tolling purposes. See Schmitt v. Zeller, 354 F. App'x 950, 951-52 (5th Cir. 2009) ("[Petitioner] delayed approximately ten months after his conviction was final before applying for state habeas relief. ... [Petitioner]'s filing the state petition after squandering most of the year available under Section 2244 is a factor in deciding whether equitable tolling should be allowed for problems that arise in later filing the federal petition."); Nelms v. Johnson, No. 01-10696, 2002 WL 31319277, at *1 (5th Cir. Sept. 30, 2002) ("This court has found no case in which equitable tolling was granted after a petitioner had let ten months of the AEDPA limitations period slip by.").

Even more importantly, however, petitioner then failed to diligently monitor the status of his Louisiana Supreme Court collateral-review applications. The record reflects that he filed two

6

such applications with the Louisiana Supreme Court challenging the Court of Appeal's denial of relief of December 28, 2015, both of which were filed on or about January 27, 2016.[16] He thereafter took no action to check the status of those applications until he sent correspondence inquiring about their status approximately *two years later* on January 18, 2018.[17] That was an unreasonable delay. As United States Magistrate Judge Sally Shushan observed in a Report and Recommendation adopted by United States District Judge Helen "Ginger" Berrigan:

> It is clear that diligence is required of one desiring equitable tolling. See, e.g., Coleman v. Johnson, 184 F.3d 398, 402 (5th Cir. 1999). Further, while this Court realizes that incarcerated persons face more obstacles than free citizens in making routine status checks on pending court matters, even prisoners are not absolved of *all* responsibility to track their litigation diligently. Accordingly, a *habeas* petitioner should not be allowed to avoid the AEDPA's statute of limitations indefinitely by making an unreasonable decision to forego even minimal efforts to check the status of his litigation with some regularity. In light of the relative brevity of the AEDPA's statute of limitations and the harsh consequences of filing after its expiration, it would seem that even the most lackadaisical prisoners would show enough concern to check the status of their pending matters with some degree of regularity.

Smith v. Terrell, Civ. Action No. 07-9449, 2009 WL 2139697, at *4 (E.D. La. July 13, 2009). Moreover, "[w]hile it may be difficult to identify the *exact* point in time at which a petitioner's willingness to idly and unquestioningly wait for notification of a court's decision crosses the line from being reasonable to unreasonable, … some such point in time must exist …." Id. Whatever that exact point may be, it is clear that waiting almost *two years* to make a status inquiry is unreasonable and so does not warrant equitable tolling. See, e.g., Stroman v. Thaler, 603 F.3d 299, 302 (5th Cir. 2010) (finding that an eighteen-month wait between inquiries as to the status of an application was not sufficiently diligent for equitable tolling); Drew v. Department of Corrections, 297 F.3d 1278, 1288 (11th Cir. 2002) (a single letter after sixteen months to check

---

[16] State Rec., Vol. 12 of 12. Both applications were accompanied by a "Writ Application Filing Sheet" dated by petitioner on January 27, 2016.
[17] Rec. Doc. 1-2, p. 2.

7

the status of a filing was insufficient to show the diligence necessary to support equitable tolling), *overruled in part on other grounds by* Sykosky v. Crosby, 187 F. App'x 953 (11th Cir. 2006); Hicks v. Quarterman, Civ. Action No. H-06-2208, 2007 WL 79706, at *5 (S.D. Tex. Jan. 8, 2007) (lack of diligence where prisoner waited one year to make first inquiry about the status of a filing and another year to make the second inquiry), aff'd, 298 F. App'x 346 (5th Cir. 2008).

For these reasons, the Court finds that petitioner has failed to establish that equitable tolling is warranted in this case.

Finally, the Court notes that a petitioner can overcome the AEDPA's statute of limitations by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013). In Perkins, the United States Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review applied in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims. Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996. Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?
> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in Schlup and House, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S., at 329, 115 S.Ct. 851; see House, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the Schlup standard is "demanding" and seldom met).

Perkins, 569 U.S. at 386.

In the instant case, petitioner has not invoked Perkins. However, in the event he does so in any objections to this Report and Recommendation, the undersigned finds that he has not made the showing required under Perkins for the following reasons.

Petitioner was convicted of second degree murder. Louisiana law defines that offense as, *inter alia*, "the killing of a human being … [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. Rev. Stat. Ann. § 14:30.1(A)(1). "Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act. Specific intent need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant." State v. Golson, 658 So. 2d 225, 230 (La. App. 2d Cir. 1995) (citations omitted). "Specific intent to kill or inflict great bodily harm can be inferred from a shooting which occurs at a fairly close range." State v. Harris, 859 So. 2d 690, 693 (La. App. 4th Cir. 2003); accord Robinson v. Cain, Civ. Action No. 07-3651, 2010 WL 3170257, at *10 (E.D. La. Mar. 19, 2010), adopted, 2010 WL 3170081 (E.D. La. Aug. 6, 2010).

In assessing a claim of actual innocence, a court normally first examines the evidence presented at trial and on which the petitioner's conviction was based. See, e.g., Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd, 667 F. App'x 474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014). In the instant case, the Louisiana Fifth Circuit Court of Appeal summarized that evidence as follows:

> Shortly after midnight on April 11, 2010, the Jefferson Parish Sheriff's Office (JPSO) received two 911 calls regarding multiple shots being fired in the 1000 block of Dimarco Street in Marrero. Sergeant Eddie Klein with the JPSO responded to the calls. When he arrived, he observed the murder victim, Rodney Ross (also known as "Mob"), lying on the ground along with ten .45 caliber casings and two 9 mm casings. An autopsy revealed the victim sustained two gunshot

9

wounds to the head and eleven gunshot wounds to the rest of his body. The autopsy also showed that two separate guns were used to shoot the victim.

During the investigation, Sgt. Klein learned that a maroon GMC or Chevy pickup truck was seen leaving the scene. Surveillance cameras from nearby businesses captured the pickup truck but not the license plate or any occupants. Sgt. Klein also discovered that a similar maroon pickup truck was involved in a non-fatal shooting with .45 caliber casings that occurred six days earlier on April 5, 2010. He viewed still photographs from surveillance video of that incident, which he subsequently showed to co-defendant Robbreion Green's mother, who thought the person in the photograph was "Telly." After a computer search, an arrest warrant was issued for Telly Westerman on April 12, 2010 for attempted murder in connection with the April 5th shooting. Westerman came into the Detective Bureau later that night, waived his rights and gave five statements, three of which related to the April 10th homicide.

In his first statement dated April 13, 2010 at 2:28 a.m., Westerman stated that on the day of the murder, he, Maurice Williams, Green, Defendant, and Ross gathered around 5:00-6:00 p.m. at Williams' mother's apartment at 1000 Dimarco. Westerman explained that he left the apartment around 10:00-11:00 p.m. and went to his girlfriend's house. He later received a phone call from Ross, who angrily accused him of taking his gun. Westerman told Ross that he did not have his gun. Ross called five to seven more times and, although no one said anything on the phone each of those times, Westerman could hear the group talking about a gun. Westerman then decided to go back to the apartment to see what was going on. When he arrived, Williams, Green, Defendant and Ross were there, and the victim was upset that someone had taken his gun.

Westerman reminded Ross that when he left, Ross was playing with his small black and gray gun and Green's gray and black 9 mm gun on the floor. At that point, Westerman and Williams decided to go to Tim's Billiards to play pool, which was located around the corner from the apartment. Green and Davis jumped into the truck with them, but Ross stayed behind. Before arriving at Tim's Billiards, Green asked Westerman to bring him back to the apartment so he could get "something."

Westerman complied and went back to the apartment. When they arrived, everyone got out of the truck except Westerman. While Westerman was waiting, he saw Williams in his rearview mirror coming down the alley. Williams opened the door of the truck and was about to enter it when Westerman heard two shots. Westerman turned around and saw Defendant shooting Ross and Ross falling to the side. Green subsequently returned to the truck and said he had shot Ross in the head with the last two shots.

According to his statement, Westerman and Williams left the scene in Westerman's truck, but later encountered Defendant and Green walking down the street and let them get into the truck. They then went to Tim's Billiards. After learning there were no pool tables available, the group walked back to the truck so Westerman could get his pool stick. Westerman told Defendant and Green to get their guns out of his truck and hide them, which they did.[FN 2] Afterward, they went back inside Tim's Billiards and then left.

10

> [FN 2]  At trial, Westerman testified that he went to Tim's Billiards so the surveillance cameras would show Defendant and Green hiding their guns.

Westerman stated he dropped everyone off on Carmadelle in front of Defendant's house, after which Westerman called his girlfriend and went to her house. Westerman told his girlfriend what had happened.[FN 3] Approximately one hour later, Williams called Westerman and told him "they" were looking for a maroon truck. Westerman later spoke to Defendant, who told him that he had talked to the police and that the police wanted to question him as well.

> [FN 3]  At trial, Westerman's girlfriend testified that Westerman told her that he saw one of the men shoot the victim first, and then the other man stood over the victim and shot him in the face and head. She explained that she went to the Detective Bureau with Westerman and gave a recorded statement to the same effect to which she testified.

In his statement, Westerman confirmed he had positively identified Green in a photographic lineup. He further stated that he knew Defendant had gone back and retrieved his gun, but was unsure whether Green had done so because he had not talked to Green since the shooting.

Westerman gave a second statement at 3:17 a.m., in which he confirmed that he had viewed photographic lineups and had positively identified Williams. He gave a third statement at 4:56 a.m., in which he stated that Defendant and Green did not walk away from the scene after they shot Ross like he claimed in his first statement, but that they got into his truck immediately after the incident.[FN 4]

> [FN 4]  Westerman's fourth and fifth statements given at 5:16 a.m. and 5:41 a.m. discussed his involvement in the April 5, 2010 non-fatal shooting. In his fourth statement, Westerman explained that he went to a gas station and three men were staring at him. Thereafter, he picked up Defendant to see if Defendant recognized the men. Words were exchanged when Westerman and Defendant encountered the men, and Defendant shot one of the men in the leg. In his fifth statement, Westerman said he had positively identified Defendant in a photographic lineup as the person who was in his truck on April 5th and who had shot at three people.

After Westerman gave his statements, Sgt. Klein obtained video surveillance from Tim's Billiards, which he said confirmed Westerman's account of what happened. Sgt. Klein further testified that Westerman's statements were consistent with the physical evidence. He stated ballistics tests showed that a .45 caliber gun and a 9 mm gun were used to kill Ross. The .45 caliber gun used in the murder was recovered and was determined to be the same gun Defendant used in the April 5, 2010 non-fatal shooting.

At trial, Westerman was the State's primary witness. Westerman's trial testimony was similar to the statements he made to the police; however, he additionally testified at trial that the day after Ross' murder, Williams showed him Ross' 9 mm gun and said, "I told that b*tch I got him." Westerman also testified that a month prior to Ross' murder, he and Williams were riding up the street when they saw Ross. Williams told Westerman to stop and he did. Williams and Ross

11

pushed each other, and Williams yelled to Ross, "I'm going to kill you b*tch." Westerman explained that Williams was upset because Ross had "hollered" at the mother of his child; however, Ross said it was Green who had done so.

Westerman explained that he omitted this information when giving his statements to the police because he wanted to protect Williams, who was his close friend. He stated he disclosed the additional information approximately one year after Ross' murder. Westerman testified that he was initially charged with second degree murder in the instant case and aggravated second degree battery in the April 5, 2010 non-fatal shooting. The aggravated second degree battery charge was later changed to three counts of attempted murder. In exchange for his trial testimony in the present case, Westerman pled guilty to reduced charges of accessory after the fact. Westerman explained that he faced zero to five years for each charge or possibly probation.[18]

The United States Supreme Court has explained that, in order to assert a credible claim of actual innocence, a petitioner is required "to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995).

In the instant case, there was obviously ample evidence of petitioner's guilt introduced at trial, and he has presented no new evidence whatsoever to show that he is actually innocent. Therefore, he cannot meet "the threshold requirement" for Perkins to apply, i.e. a showing that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" Perkins, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329). Accordingly, Perkins does not aid him.

Because petitioner is not entitled to further statutory tolling, and because he has not established that he is eligible for equitable tolling or that he is actually innocent, his federal

---

[18] State v. Davis, 128 So. 3d 1162, 1163-65 (La. App. 5th Cir. 2013); State Rec., Vol. 2 of 12.

application for habeas corpus relief had to be filed no later than **September 7, 2017**, in order to be timely. His application was not filed until **March 8, 2018**, and, therefore, it was untimely.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Jeffery Davis be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ___3rd___ day of June, 2020.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**